**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

BARBARA LENN WOODS,

        Plaintiff,

vs.                               Case No. 3:04-cv-1227-J-MCR

JO ANNE B. BARNHART,
Commissioner of the
Social Security Administration,

        Defendant.

_____/

**MEMORANDUM OPINION AND ORDER**

      This cause is before the Court on Plaintiff's appeal of an administrative decision denying her application for Social Security benefits for the time period from October 2, 1993 through March 31, 1996.[1]  The Court has thoroughly reviewed the record, the briefs, and the applicable law.  For the reasons set forth herein, the Commissioner's decision is **REVERSED** and the matter **REMANDED** for proceedings not inconsistent with this opinion.

**I.**     **PROCEDURAL HISTORY**

      Plaintiff filed an application for a period of disability and disability insurance benefits ("DIB") on April 26, 2002, alleging an inability to work since October 2, 1993. (Tr. 45-53).  The Social Security Administration ("SSA") denied this application initially and on reconsideration. (Tr. 23-27, 29-31).  Plaintiff then requested and received a

---

[1]The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge.  See Doc. 15.

1

hearing before an Administrative Law Judge (the "ALJ"). (Tr. 32, 623-659). On June 25, 2004, the ALJ issued a decision concluding that Plaintiff is not disabled within the meaning of the Social Security Act. (Tr. 14). Plaintiff filed a Request for Review by the Appeals Council, and on September 24, 2005, the Appeals Council denied Plaintiff's request for review, thus making the ALJ's decision the final decision of the Commissioner. (Tr. 6-9). Plaintiff timely filed her Complaint in the U.S. District Court on November 23, 2004. (Doc. 1).

## II.   NATURE OF DISABILITY CLAIM

### A.   Basis of Claimed Disability

Plaintiff claims to be disabled since October 2, 1993, due to degenerative disk disease, spinal stenosis, diabetes, multiple sclerosis, migraine headaches, vertigo and depression. (Tr. 15, 55).

### B.   Summary of Evidence Before the ALJ

Plaintiff was 52 years of age at the time the ALJ conducted the administrative hearing. (Tr. 625). She is a high school graduate with two years of college education. (Tr. 626). Her past work includes employment as a church secretary and bookkeeper and as a daycare worker for children. (Tr. 56, 72-74). Plaintiff was insured for disability benefits through March of 1996 (Tr. 50). Plaintiff's medical history is set forth in the ALJ's decision. By way of summary,[2] Plaintiff was treated for multiple medical conditions including depression, unknown neurological disorders later diagnosed as Multiple Sclerosis, back pain, and diabetes.

---

[2]This summary is limited to the evidence relevant to the issues on appeal.

The medical records demonstrate that Plaintiff sought treatment from Dr. Baird, her gynecologist from November 27, 1991, through April 16, 1997.  (Tr. 221-272). In 1991, Plaintiff began seeing Dr. Baird for an evaluation of possible hormonal imbalance. She complained of "having a lot of mood swings and thoughts of suicide".  (Tr. 270). She continued to complain of depression, mood swings and having suicidal thoughts throughout her entire time seeing Dr. Baird.  (Tr. 264, 259, 226).

In 1995, Plaintiff began experiencing abdominal pains which were related to her continued menorrhagia, ovarian cysts and a "fibroid uterus."  (Tr. 242).  In September 1995, Plaintiff underwent surgery at St. Lukes Hospital for a hysterectomy and salpingo-oophorectomy, after which Plaintiff had complications due to lysis and adhesions of her small bowel.  (Tr. 93-104; 105-114).  She recovered, but continued to have emotional problems dealing with her surgery.  (Tr. 226). Dr. Baird attempted to stabilize Plaintiff's hormones, but in January of 1996, he prescribed her Zoloft because he believed her hormones should have been stabilized and yet she was still experiencing emotional upheavals.  (Tr. 226).  Dr. Baird's report dated January 5, 1996, notes that Plaintiff states that "she is meaner and she feels like she is really losing it." Id.

On February 19, 1996, Plaintiff began seeing Dr. Kaplan, a psychologist, and underwent various psychological evaluations. (Tr. 115-118).   On March 20, 1996,  Dr. Kaplan, one of Plaintiff's treating psychologists, diagnosed Plaintiff with Anxiety, Anger and Depression.  (Tr. 116).  Also in March of 1996, Dr. Kaplan referred Plaintiff to Dr. Solloway, a psychiatrist, because of Plaintiff's erratic behavior and depression.  (Tr. 219).

On March 6, 1996, Dr. Solloway noted that psychological testing, specifically the

MMPI done by Dr. Kaplan "indicates that Plaintiff tends to somatize, tends to be histrionic and there are some indicators that there may be some dissociative element to her illness." Id. at 220.  Dr. Solloway reported, after evaluating Plaintiff himself, that she admits "there are things that are hazy to her," and she sometimes "has the same conversation over and over with her husband."   Id.  Dr. Solloway also  found that Plaintiff "tends to be irritable, forgetful and at times anxious," as well as "vaguely inappropriate. . . almost seductive. " Id. at 219-220.  And although "her speech was goal directed," there were times when she would grope for words." Id. at 220.  Although Dr. Solloway noted that Plaintiff showed very little signs of depression, he diagnosed her with Adjustment Disorder with Mixed Features of Anxiety and Depression, Traits of Somatization Disorder, and Traits of Histrionic Personality Disorder.  Id.  He advised psychotherapy and continued her on Zoloft medication.  Id.

Several years later, two state agency psychological consultants reviewed both Dr. Kaplan and Dr. Solloway's reports and provided definitive diagnoses of Plaintiff's mental impairments along with additional insight, for the purpose of evaluating her mental claims in light of this lawsuit.  In September of 2002, Janice Miller -- a state Clinical Psychologist, reported that Plaintiff's impairments included Affective Disorders and Somatoform Disorders which caused moderate limitations in Plaintiff's ability to: understand, remember, and carry out detailed instructions; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and set realistic goals or make plans independently of others.  (Tr. 449, 451, 452).  Ms.

4

Miller assessed Plaintiff's limitations as not significant with respect to the remainder of the tasks for which she was evaluated.   Ms. Miller summarized her findings by stating that Plaintiff was "able to perform simple tasks but complex tasks may be limited by depression and anxiety," and that she  "may distract others with her 'vaguely inappropriate behavior' – at times coquettish/inappropriate for age."  (Tr. 451-453).   She also noted that Plaintiff's "pace may be interrupted episodically when physical problems exacerbate.  Adaptive skills appear intact–she will benefit from therapy."  (Tr. 453).

On December 11, 2002, Val Bee, a second Clinical Psychologist also diagnosed Plaintiff's mental impairments as falling within the categories of Affective Disorders and Somatoform Disorders.  (Tr. 485).  She noted that Plaintiff's disorder caused: moderate limitations in maintaining concentration, persistence, or pace; mild limitations with respect to restriction of Plaintiff's daily living and difficulties in maintaining social functioning; and no limitations with respect to Plaintiff's episodes of decompensation  (Tr. 495).  On the mental RFC Assessment, Ms. Bee found Plaintiff moderately limited with respect to her: ability to maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and set realistic goals or make plans independently of others. (Tr. 500).

Ms. Bee also found Plaintiff not significantly limited with respect to the other topics. Id.   Finally, Ms. Bee summarized Plaintiff's  functional capacity by stating "[i]nformation prior to 3/96 suggests that while emotional symptoms and psychosomatic preoccupation may have caused some disruptions in concentration and efficiency,

5

[Plaintiff] appeared able to meet the mental demands of well structured task activity; she appeared capable of at least superficially appropriate interaction – may have benefitted from goal setting assistance." (Tr. 501-502).

On January 17,1994, Plaintiff began seeing Dr. Hodson, a neurologist, because she did not feel normal; she complained of feeling tired all the time and "she developed fever blisters on her lip and gums and felt a sense of facial numbness." (Tr. 380). She also complained of visual blurring. Id. After a neurological evaluation, Dr. Hodson found "possible demyelinating disease with visual vestibular and peripheral symptomatology." Id. at 382. He also noted that her exam was "relevant for decreased vibration and left sided temperature appreciation." Id. Subsequently, Dr. Hodson performed various tests on Plaintiff which were essentially normal.[3] (Tr. 348-373). Plaintiff's Multiple Sclerosis laboratory report did, however, show an abnormality in the serum albumin, which is one of the factors tested in studies to determine whether a patient has Multiple Sclerosis (Tr. 372).

On January 29, 2004, Plaintiff went to the Emergency Room at Memorial Hospital because she had facial tingling, general fatigue and weakness in her left hand. (Tr. 344). Dr. Hodson evaluated her later that day and found no significant change from his prior neurologic exam. (Tr. 345). He did, however, want to follow her closely. Id. In February of 1994, Dr. Hodson reported that Plaintiff was still having worries about her facial dysesthesias and previous Bell's Palsy, but he also reported that her "CSF did not confirm evidence of MS." (Tr. 343).

---

[3]Although the results of Plaintiff's tests were essentially normal, Dr. Hodson did report that a Posterior Tibial Somato Sensory Evoked Potential Study showed Plaintiff had minimal distal delay.

6

In August 1994, Dr. Hodson documented Plaintiff's complaints of severe "shock like headaches followed by a sense of dizziness and slightly altered awareness," along with a "loss of control of her mental processing." (Tr. 342). Again, however, he said her neurological examination was normal, but that he needed to watch her carefully. (Tr. 342). Although initially Dr. Hodson did not believe Plaintiff suffered from MS, he continued to note her symptoms of severe headaches and dizziness, delayed reactions and loss of concentration, blurred vision, facial numbness, and multiple complaints of dysesthesias through 1998 (Tr. 342, 376-378), at which time he referred her to another doctor for a re-evaluation. (Tr. 336-340).

On November 30, 1998, Dr. Martin Northrup interpreted an MRI of Plaintiff's brain without contrast and found it indicative of Multiple Sclerosis. (Tr. 320). Specifically, he noted "[h]igh signal intensity lesion with plaquing along the left lateral ventricle frontal horn without enhancement with gadolinium suggesting old lesions of multiple sclerosis." Id. On December 3, 1998, Dr. Hodson also reported Plaintiff's diagnosis as Multiple Sclerosis. (Tr. 314, 315).

There are various other pages of medical reports documenting Plaintiff's conditions, including her: lower back pain and bulging discs; severe migraines; blurred vision; depression; complaints of numbness and tingling in her face and extremeties; transitory left hemiparesis and dysphoric episodes; bladder problems, chronic fatigue; and stomach problems, which occurred after the relevant time period. (E.g. Tr. 182-217, 273-279, 503-506, 507-550; 569-619 ). Of particular importance, however, are the documents relating to Plaintiff's care under Dr. Nabizadeh, a neurologist. Plaintiff was seen by Dr. Nabizadeh from 2001 through 2003 for her Multiple Sclerosis, Lumbar

7

spondylosis, Cervical spondylosis, Myofascial Pain Syndrome, and Migraine headaches. (Tr. 551-568).

### C.    Summary of the ALJ's Decision

The ALJ determined that Plaintiff met the nondisability requirements of the Act and was insured for benefits through March 31, 1996.  (Tr. 15, 20-21).  At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since her alleged onset date.  (Tr. 16, 21).  At step two, the ALJ found Plaintiff's disorders of the lumbar spine, non-insulin dependent diabetes mellitus, and migraine headaches "severe" based on the requirements in 20 C.F.R. § 404.1520(c).  (Tr. 16, 21).  The ALJ determined, however, that Plaintiff failed to establish the existence of a medically determinable mental impairment prior to her date last insured.  (Tr. 16).  He further found that Plaintiff's complaints of suffering from Multiple Sclerosis were not substantiated by the medical evidence.  Id.

At step three, the ALJ determined Plaintiff did not have an impairment, or any combination thereof, which met or equaled one of the impairments listed in Appendix 1, Subpart P of Regulation No. 4.  (Tr. 16, 21).  Specifically, he noted that although the Plaintiff likely suffered from non-insulin dependent diabetes mellitus, migraine headaches, and back pain, these impairments were not significantly limiting until after Plaintiff's last insured date.  (Tr. 17).

At step four, the ALJ considered Plaintiff's symptoms along with the medical evidence and medical opinions from relevant sources to determine Plaintiff's residual functional capacity.  In doing so, the ALJ opined that Plaintiff's statements concerning her "impairments and their impact on her ability to work were not entirely credible in light

8

of her medical history and the reports of her treating and examining practitioners, the degree of medical treatment required and the [Plaintiff's] own description of her activities and lifestyle." (Tr. 16).  Additionally, the ALJ noted that the record evidence relevant to the period prior to the claimant's date last insured was very limited.  (Tr. 16).

After seeking the opinion of a vocational expert, the ALJ ultimately determined that Plaintiff retained the residual functional capacity (RFC) to perform sedentary to light work on a sustained basis up through March 31, 1996.  (Tr. 19, 21).  Specifically, the ALJ determined that Plaintiff could:  lift and/or carry, and push/pull 10 pounds frequently and 20 pounds occasionally; walk and/or stand for approximately two hours per eight-hour workday; sit for a full eight-hour workday; use her arms and hands for normal grasping, holding and turning objects without limitation; perform occasional bending, stooping, crawling, and kneeling, but she should avoid unprotected heights, heavy machinery and unusual stress.  (Tr. 19)

Accordingly, the ALJ found that prior to March 31, 1996, Plaintiff retained the ability to perform her past relevant work as a secretary.  (Tr. 19, 21).  Although unnecessary, the ALJ further stated that had Plaintiff been found incapable of performing any vocationally relevant past work, she still would not be disabled because, as the vocational expert opined, there are jobs existing in significant numbers in the national economy which the Plaintiff was able to perform.  (Tr. 20).  As such, the ALJ determined that Plaintiff was not disabled, prior to March 31, 1996, within the meaning of the Social Security Act.  (Tr. 20, 21).

III.    **STANDARDS OF LAW**

A.    <u>**The Standard of Review**</u>

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, <u>McRoberts v. Bowen</u>, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence.  <u>Richardson v. Perales</u>, 402 U.S. 389, 390, 91 S.Ct. 1420 (1971).  The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995), <u>citing</u> <u>Walden v. Schweiker</u>, 672 F.2d 835, 838 (11th Cir. 1982) and <u>Richardson</u>, 402 U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  <u>Edwards v. Sullivan</u>, 937 F.2d 580, 584 n.3 (11th Cir. 1991); <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  <u>Foote</u>, 67 F.3d at 1560; <u>accord</u>, <u>Lowery v. Sullivan</u>, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

**B.    The Five Step Evaluation**

A plaintiff is entitled to disability benefits when she is unable to engage in

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to either result in death or last for a continuous period

of not less than 12 months.  42 U.S.C. §§ 416(I), 423(d)(1)(A); 20 C.F.R. § 404.1505.

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. § §

404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is

not disabled.  29 C.F.R. § 404.1520(b).  Second, if a claimant does not have any

impairment or combination of impairments which significantly limit her physical or mental

ability to do basic work activities, then she does not have a severe impairment and is not

disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an

impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20

C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent her from doing

past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's

impairments (considering her residual functional capacity, age, education, and past

work) prevent her from doing other work that exists in the national economy, then she is

disabled.  20 C.F.R. § 404.1520(f).  Plaintiff bears the burden of persuasion through step

four, while at step five, the burden shifts to the Commissioner.  Bowen v. Yuckert, 482

U.S. 137, 146 n.5 (1987).

**IV.    ANALYSIS**

Plaintiff argues three issues on appeal.  First, Plaintiff asserts that the ALJ erred

by failing to consult a medical expert regarding the onset date of Plaintiff's disability.

Second, she contends the ALJ erred in evaluating the severity of Plaintiff's depression.

11

Finally, Plaintiff claims that this Court should remand this case under the sixth sentence of 42 U.S.C. § 405(g) in light of the new and material evidence from Plaintiff's treating neurologist, who opines that evidence existed prior to Plaintiff's last insured date which was sufficient to make a clinical diagnosis of Plaintiff's multiple sclerosis.[4]

> **A.** **Whether the ALJ committed reversible error by failing to consult a medical expert regarding the onset date of Plaintiff's Multiple Sclerosis?**

The first issue in this case is whether the ALJ had a duty to consult a medical expert to determine the onset date of Plaintiff's Multiple Sclerosis ("MS"). Plaintiff alleges a disability based on, among other things, her MS. (Tr. 55, 57, 69, 80). In order to receive disability benefits, Plaintiff is required to establish that her disability began before March 31, 1996. Plaintiff contends that the ALJ erred by failing to consult a medical expert regarding the onset of Plaintiff's MS because the medical evidence relating to Plaintiff's disability is ambiguous. (Doc. 26, p. 11). Plaintiff cites Social Security Ruling 83-20 as the basis for her argument that Defendant was required to consult a medical expert.     Id. at 12. Social Security Ruling ("SSR") 83-20 sets forth the policy for establishing the onset date of disability.[5] "Factors relevant to the determination of disability onset include the individual's allegations, the work history, and the medical evidence." SSR 83-20. The Ruling also provides insight on how to establish the disability onset date in cases where precise evidence of such date is not available. Id. It

---

[4]This Court will address each of Plaintiff's issues, however, not in the order they were raised. As issues one and three are interrelated, the Court will address those first.

[5]Published Social Security Rulings are "binding on all components of the Social Security Administration." Heckler v. Edwards, 465 U.S. 870, 873 n. 3, 104 S.Ct. 1532, 1534 n.3 (1984); see also Grebenick v. Chater, 121 F.3d 1193, 1200 (8th Cir. 1997).

advises that it may be necessary to infer the onset date of a disabling impairment.  Id.

Specifically, SSR 83-20 provides:

> [I]n the case of slowly progressive impairments, it is not necessary for an impairment to have reached listing severity (i.e., be decided on medical grounds alone) before onset can be established. . . .How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in a particular case.  This judgement, however, must have a legitimate medical basis.  *At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.*

Id.  (Emphasis added).  Plaintiff relies on this language in arguing that the ALJ erred by not consulting with a medical advisor.

Defendant, on the other hand, argues that SSR 83-20 only applies when a claimant has been found to be disabled.  (Doc. 29, p. 8).   Here, the Defendant asserts SSR 83-20 is inapplicable because the ALJ determined that Plaintiff was not disabled at the date she was last insured, nor anytime after such date.  Id.

This Court rejects Defendant's argument and finds that, for the reasons set forth below, SSR 83-20 should be interpreted as requiring the ALJ to consult with a medical expert regarding the onset date of a disability because Plaintiff alleges a slow progressing impairment and the medical evidence is ambiguous, despite the fact that the ALJ determined Plaintiff was not disabled.  Moreover, this Court interprets SSR 83-20 as requiring the ALJ to consult a medical expert when the ALJ is required to make an inference regarding the *onset and existence* of a disability.

While the Eleventh Circuit has not yet considered the issue of when an ALJ is required to obtain the advice of a medical expert, several other circuits have interpreted the medical expert provision of SSR 83-20.  The Third and Eight Circuits have both held

that when a Plaintiff's impairment is slowly progressive and the medical evidence is ambiguous or inadequate, then the ALJ is required to make a retroactive inference of disability onset and is required to call on a medical expert to assist in such inference. See Walton v. Halter, 243 F.3d 703, 709 (3d Cir. 2001) (concluding that when a case involves a slowly progressive impairment and adequate medical records are unavailable, the SSR 83-20 requires the ALJ to call upon a medical advisor to assist in inferring the onset date)**;** Grebenick v. Chater, 121 F.3d 1193, 1201 (8th Cir. 1997) (rejecting the Commissioner's argument that SSR 83-20 does not apply if the ALJ determined claimant was not disabled because SSR 83-20 explains that "the determination of the onset date is critical because it . . . may even be determinative of whether the individual is entitled to or eligible for any benefits," and stating that when medical evidence is ambiguous and a retroactive inference is necessary, SSR 83-20 requires the ALJ to utilize a medical examiner to ensure that determination of onset is based on a medically legitimate basis).

Other courts of appeal have, however, taken a more restrictive approach when applying SSR 83-20's medical expert provision.  For instance, the Sixth and Seventh Circuits have noted that SSR 83-20 does not apply when the ALJ finds that the claimant does not suffer from a disability.  See Scheck v. Barnhart, 357 F.3d 697, 701 (7th Cir. 2004) (rejecting claimant's argument that the ALJ erred by not calling a medical expert to determine onset date of alleged disability because SSR 83-20 only applies when ALJ determines that claimant is disabled); Key v. Callahan, 109 F.3d 270, 274 (6th Cir. 1997) (agreeing with the Commissioner that SSR 83-20 applies only when there has been a finding of disability and it is necessary to determine when the disability began).

As stated above, this Court agrees with the more liberal reading of SSR 83-20

and joins the Third and Eighth Circuits, along with at least one other Judge in the Middle

District of Florida, in finding that SSR 83-20 applies when the medical evidence is

ambiguous and Plaintiff complains of a slow progressing disease, regardless of whether

the ALJ determined Plaintiff has a disability.   This Court finds Judge Jones'  reasoning

particularly persuasive:

> Because the issue of onset is inextricably tied to the determination of
> disability in cases where the impairment is a slowly progressive condition
> that is not traumatic in origin, the Court concludes that the most logical
> interpretation of the SSR 83-20 is to apply it to situations where the ALJ is
> called upon to make a retroactive inference regarding disability involving a
> slowly progressive impairment, and the medical evidence during the
> insured period is inadequate or ambiguous.

McManus v. Barnhart, No.  5:04-cv-67-OC-GRJ, 2004 WL 3316303, at *6 (M.D. Fla.

Dec. 14, 2004).

Here, Plaintiff asserts, and the medical record establishes, that Plaintiff suffers

from a slowly progressive condition of MS. (Doc. 26, p. 13); (Tr. 293-382, 551-568).

Additionally, she alleges that her neurological problems which are related to her MS,

date back to1993 (Doc. 26, p. 13), but that there is very limited medical evidence

pertaining to her condition during the time she was last insured for benefits (Doc. 26, p.

11).   In fact, the ALJ agreed that there is limited evidence concerning the period prior to

the claimant's date last insured.  (Tr. 17).   Finally, Plaintiff argues that the slow

progression of impairment coupled with the inadequate medical evidence, required the

ALJ to make a "retroactive  inference" regarding the onset of her disability.  (Doc. 26, pp.

15-16).   As such, the ALJ was required to consult a medical expert regarding the onset

date of her MS.   Id.

In his analysis of whether Plaintiff is or was disabled, the ALJ quickly dismissed

Plaintiff's claims that she suffered from MS and stated that the Plaintiff's complaints have not been substantiated with objective medical evidence. (Tr. 17). In coming to this conclusion, the ALJ relied on the 1994 report by Dr. Hodson, Plaintiff's treating neurologist at the time, which stated that the MRI and/or CT performed on Plaintiff failed to confirm a diagnosis of MS. (Tr. 17). Additionally, the ALJ stated that "[m]ore recent workup by Dr. Hodson has likewise failed to confirm such diagnosis as late as February 1999 because diagnostic testing has consistently been 'negative'." Id. This, however, is an incorrect statement of the medical evidence, as the medical records show that Plaintiff was definitively diagnosed with MS.

On November 30, 1998, Dr. Martin Northup interpreted an MRI of Plaintiff's brain and concluded that there was "high signal intensity lesion with plaquing along the left ventricle frontal horn without enhancement with gadolinium suggesting *old lesions of multiple sclerosis*." (Tr. 320, emphasis added). Therefore, Plaintiff was diagnosed with MS in 1998; however, the MRI showed *old lesions of multiple sclerosis* and thus, it is unknown how long such lesions were visible and when Plaintiff's MS was first detectable. Moreover, medical records from Dr. Hodson, dated after November 1998, are also consistent with a diagnosis of MS. For instance, on December 2, 1998, Dr. Hodson saw Plaintiff for a follow up visit and reported a diagnosis of MS. (Tr. 314-315). Additionally, on January 26, 1999, Dr. Hodson again confirmed that Plaintiff had a "clinical picture consistent with MS" and reported that "her MRIs have confirmed an evolving pattern. . . . The immunologic features are consistent with MS." (Tr. 296). In fact, even up to the date this lawsuit was filed, Plaintiff continued to seek assistance from Dr. Nabizadeh, her current neurologist, for her symptoms relating to her MS. (Tr. 555-568).

16

After a thorough review of all of the medical evidence, this Court finds that Plaintiff's MS is a slowly progressive impairment and the evidence pertaining to the onset of Plaintiff's MS was ambiguous.  In fact, the medical evidence, when viewed in whole, demonstrates that Plaintiff was likely experiencing symptoms of MS during the relevant time period.   For instance, during the relevant time period, Plaintiff complained of: depression; fatigue; numbness and tingling to her face; blurred vision; severe headaches, slightly altered awareness, loss of concentration; and delayed action.  ( E.g., Tr. 115-118, 342, 376, 377, 379, 380, ).  Each of these symptoms, while not entirely conclusive, are common among persons diagnosed with MS.[6]   Notably, MS is a disease which can be difficult to diagnose.[7]

Even if Plaintiff's MS was not diagnosable prior to the date she was last insured, the medical records definitively show that Dr. Hodson reported that Plaintiff was experiencing some type of demyelinative condition as early as 1993.  In fact, he reported that the results of an MRI study dated December 20, 1993 "demonstrated multiple punctate foci of T2 hyperintensity in the periventricular white matter as well as the right

---

[6]"Symptoms of MS are unpredictable and vary from person to person and from time to time in the same person."  See National Multiple Sclerosis Society, http://www.nationalmssociety.org/Symptoms.asp (last visited April 27, 2006). The most common symptoms associated with MS include: bladder dysfunction; bowel dysfunction; changes in cognitive function including problems with memory, attention and problem-solving; dizziness and vertigo; depression and emotional changes; fatigue; difficulty in walking and/or balance or coordination problems; abnormal sensations such as numbness or "pins and needles"; pain; sexual dysfunction; spasticity; and visual problems.  Id.  Some of the symptoms which tend to be less common include: headaches; hearing loss; itching; seizures; speech and swallowing disorders; and tremors.  Id.  Notably, the medical record indicates Plaintiff experienced 9 out of 13 of the most common symptoms and at least 1 of the less common symptoms.

[7]Diagnosing MS can be very difficult.  See National Multiple Sclerosis Society, http://www.nationalmssociety.org/brochures-On%Diagnosis.asp (last visited April 27, 2006).  In fact, there is no single test that can be used to confirm MS.  Id.  Rather, the process of diagnosis typically involves: evidence from the person's history, a clinical examination, and one or more laboratory tests.  Id.  Often times, a physician will require all three of these in order to rule out other possible causes for symptoms. Id.

brainstem" which were "consistent with a demyelinating process." (Tr. 380).

Notably, the ALJ did not discuss Plaintiff's MS or her demyelinative condition other than rejecting her MS claims outright because he relied solely on Dr. Hodson's 1994 report to Plaintiff's primary physician which stated that "her CSF did not confirm MS." (Tr. 17, 379).   The ALJ erred in relying solely on this report because the medical records, when viewed in whole, demonstrate that Plaintiff was later diagnosed with MS and that her onset date is unclear.   The ALJ ignored the majority of the evidence relating to Plaintiff's MS and demyelinating disease in his report.   (Tr. 14-22).   Where an ALJ focuses on one piece of evidence and disregards other contrary evidence, an administrative decision cannot be found to be supported by substantial evidence.   See McCruter v. Bowen, 791 F.2d 1544, 1548 (11th Cir. 1986).

Significantly, MS is one of the impairments listed in the Social Security Administration Regulations and the ALJ should have conducted a thorough analysis of the extent of Plaintiff's disability relating to her MS and/or her demyelinative condition. See 20 C.F.R. pt. 404, subpt. P, app.1, § 1109 (2005).[8]   Had he done so, as this Court has, he likely would have realized that the evidence relating to the onset of Plaintiff's MS was ambiguous and an expert should have been utilized in making a medically sound retroactive inference.

Even though it was not until November of 1998 that Plaintiff was actually diagnosed with MS, the medical evidence coupled with Plaintiff's testimony shows that

---

[8]In order for MS to qualify as a disability under the Social Security Act, Plaintiff must demonstrate that she suffered from one of three forms of MS: disorganization of motor function, visual or mental impairment, and significant fatigue demonstrated on physical examination.   See id.

Plaintiff experienced symptoms which may have been related to her MS before the date she was last insured.  Moreover, in light of the fact that Dr. Hodson's report, dated November 30, 1998 (Tr. 320), showed "old lesions of Multiple Sclerosis," this Court finds that the medical evidence with regard to Plaintiff's onset date of her MS is ambiguous. Consequently, the ALJ erred in failing to consult a medical expert regarding the onset of Plaintiff's MS.   Accordingly, remand is required and the ALJ should consult a medical expert to determine Plaintiff's onset date with respect to her MS.

**B.**     **Whether this Court should remand this case under the sixth sentence of 42 U.S.C. § 405(g) in light of the new and material evidence from Plaintiff's treating neurologist**?

Because this Court already found that this case should be remanded for the reasons stated above, it is not necessary for this Court to decide whether a sentence six remand is proper.  This Court does conclude, however, that on remand, the ALJ along with a consulting medical expert, should consider the report dated November 12, 2004, in which Dr. Nabizadeh opines that the onset date of Plaintiff's neurological problem should be considered 1993.  (Doc. 26, Ex. 2).

The Court has considered Dr. Nabizadeh's report in light of the evidence of record and finds that it is new non-cumulative evidence that is material with respect to the onset date of Plaintiff's MS diagnosis. Nowhere in the record is there evidence that any physician has opined as to when Plaintiff's MS began.  Moreover, this new evidence is material because there is a reasonable possibility that the new evidence could change the outcome of this case.  See Hyde v. Bowen, 823 F.2d 456, 459 (11th Cir. 1987).  The Court is also of the opinion that Plaintiff should not be denied an opportunity to present

material evidence to the ALJ just because this report was not procured by prior counsel.

Moreover, the Federal Regulations demonstrate that the report should be reviewed on

remand, as they state that any issues relating to Plaintiff's claim should be considered on

remand regardless of whether they were raised in the prior administrative proceedings.

See 20 C.F.R. §§ 404.983, 404.984 (2005).

**C.   Whether the ALJ erred in evaluating the severity of Plaintiff's depression?**

Finally, Plaintiff argues that the ALJ erred in evaluating Plaintiff's depression.

Plaintiff sets forth two sub-arguments with regard to this issue.  First, she claims that in

concluding that Plaintiff did not have a significant mental impairment,  "the ALJ rejected

the unrebutted evidence from both treating and non-examining State agency medical

consultants that [Plaintiff's] depression was more than slight or minimal prior to the date

she was last insured for benefits."  (Doc. 26, p. 16).  Second, Plaintiff argues that the ALJ

failed to comply with the required technique for analyzing mental impairments found at

20 C.F.R. § 404.1520a.  (Doc. 26, p. 19).

**1.   Did the ALJ err in finding that Plaintiff's depression was not severe?**

Plaintiff's argument, that the ALJ erred in determining that the evidence failed to

establish Plaintiff had a significant mental impairment, implicates the ALJ's determination

at step two of the five-step evaluation process.  At step two, the ALJ is called upon to

determine whether a claimant's impairments are severe.  By definition, this is a

"threshold inquiry."  McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986).  In Brady

v. Heckler, 724 F.2d 914, 920 (11th  Cir.1984), the Eleventh Circuit held that "[a]n

impairment can be considered as not severe only if it is a slight abnormality which has

such a minimal effect on the individual that it would not be expected to interfere with the

individual's ability to work, irrespective of age, education, or work experience." Brady,

724 F.2d at 920.

As the McDaniel court noted, the analysis at step two "allows only claims based

on the most trivial impairments to be rejected." McDaniel, 800 F.2d at 1031. "Claimant

need show only that her impairment is not so slight and its effect is not so minimal."

McDaniel, 800 F.2d at 1031. However, the Eleventh Circuit has elaborated by noting:

"'severity' of a medically ascertained disability must be measured in terms of its effect

upon ability to work, and not simply in terms of deviation from purely medical standards

of bodily perfection or normality." McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir.

1986); see also 20 C.F.R. § 404.1521(a) (2003) ("An impairment or combination of

impairments is not severe if it does not significantly limit your physical or mental ability to

do basic work activities.").

The Court finds that Plaintiff suffered from depression, however, whether

Plaintiff's depression was  "not so slight and its effect not so minimal" prior to March 31,

1996, is a close call.  The Court is hesitant to hold that the ALJ erred in holding that

Plaintiff did not suffer from a medically determinable mental impairment.  (Tr. 16).  On

the other hand, the Court notes that Plaintiff has arguably offered evidence that suggests

her depression was more than "a slight abnormality which has such a minimal effect on

the individual that it would not be expected to interfere with the individual's ability to

work." Brady, 724 F.2d at 920.

The ALJ based his finding that Plaintiff's depression was not severe on the facts

21

that no definitive diagnosis was ever confirmed and Dr. Kaplan failed to make findings concerning Plaintiff's perceived ability to work.  (Tr. 17-18).  Moreover, while the ALJ acknowledged the State agency psychologists findings that Plaintiff had "moderate limitations concerning concentration," he states that they found Plaintiff "able to perform work at the [sic] all exertional levels." (Tr. 18).

A review of the documentation relating to Plaintiff's depression reveals that there is evidence in the record that both Dr. Kaplan and Dr. Solloway diagnosed Plaintiff with Depression.  In fact, Dr. Kaplan diagnosed Plaintiff as having Anxiety, Anger and Depression (Tr. 116), while Dr. Solloway diagnosed Plaintiff with Adjustment Disorder with Mixed Features of Anxiety and Depression; Traits of Somatization Disorder; and Traits of Histrionic Personality Disorder.  (Tr. 219).   Additionally, there is no evidence in the record which demonstrates that the agency psychologists opined on Plaintiff's ability to work at all exertional levels.  Rather, both the non-examining state agency psychological consultants believed Plaintiff suffered from depression which at least moderately affected her ability to concentrate and which raised questions as to her ability to complete a normal work-day or work-week without an unreasonable number of distractions or absences.  (Tr. 452, 500).

Because it is questionable as to whether Plaintiff's depression met the severity standard implicated by step 2 of the five step evaluative analysis required for disability insurance benefits, on remand the ALJ should take a more thorough look at the medical evidence on record relating to her depression.  The Court also notes that the ALJ should pay particular attention to the fact that Plaintiff may have been suffering from physical symptoms of MS during the relevant time period, which could arguably affect her mental

22

impairment.[9]   Finally, the Court notes that upon making its decision, the ALJ should

discuss the four factors required by the Social Security regulations which are discussed

below.

> **2.      Whether the ALJ failed to comply with the techniques set forth in 20 C.F.R. § 404.1520a when analyzing Plaintiff's depression?**

Plaintiff cites Eleventh Circuit precedent in arguing that the ALJ failed to comply

with the techniques prescribed by 20 C.F.R. § 404.1520a in analyzing whether Plaintiff

suffered from disabling depression.  (Doc. 26, 20). The Eleventh Circuit's holding in

Moore v. Barnhart, 405 F.3d 1208 (11th Cir. 2005), demonstrates that the ALJ's failure to

discuss the four factors required by the regulations requires remand.  The regulations

dictate that upon evaluating mental impairments, the ALJ must separately evaluate how

Plaintiff's mental impairment impacts four functional areas: activities of daily living; social

functioning; concentration, persistence, or pace; and episodes of decompensation.   20

C.F.R. § 404.1520a (c)(3).

In Moore, the Eleventh Circuit states that "where claimant has presented a

colorable claim of mental impairment, the social security regulations require the ALJ to

complete a [Psychiatric Review Technique Form], append it to the decision, or

incorporate its mode of analysis into his findings and conclusions," and "[f]ailure to do so,

requires remand."  405 F.3d at 1214.  The Psychiatric Review Technique Form ("PRTF")

requires a separate evaluation on a four point scale of each of the four functional areas

---

[9]People who are diagnosed with MS or other chronic diseases experience depression more than the general population.  See National Multiple Sclerosis Society, http://www.nationalmssociety.org/Brochures-On%Depression.asp (last visited on April 27, 2006).  Dr. David Michelson, a staff psychiatrist in the neuro-endocrinology branch of the National Institute of Mental Health, has studied the interaction among the body's nervous, hormone, and immune systems in people with depression.  He states, "[t]here is some evidence to suggest that the physiology of MS may predispose people to depression. At the same time, people with MS carry the burden of changes in daily life and losses of function."  Id.

mentioned above.  See id. at 1213.

In the instant case, the ALJ mentioned that it found Plaintiff's activities of daily living inconsistent with her allegations of disability.  The ALJ, however, failed to specifically evaluate the four functional areas on a four point scale or attach a PRTF to its decision.  Although the Court has asked the ALJ to reevaluate Plaintiff's depression on remand, the Court does find that Plaintiff has at least stated a "colorable claim" for depression.  A "colorable claim of mental impairment" is one that is "seemingly valid and genuine," Kovacs v. Chesley, 406 F.3d 393, 396 n. 2 (6th Cir. 2005); it does not mean that Plaintiff had to state a meritorious claim based on Plaintiff's depression.   Because this Court finds that Plaintiff has at least stated a colorable claim for depression, the ALJ erred when it failed to complete a PRTF and append it to its decision, or incorporate its mode of analysis into its conclusions, as it was required to do.  Accordingly, upon remand the ALJ must evaluate Plaintiff's mental impairments under the applicable regulations.

## V.    CONCLUSION

For the foregoing reasons, the undersigned believes the Commissioner's decision is not supported by substantial evidence, nor decided according to the proper legal standards, and is therefore **REVERSED** and **REMANDED** pursuant to sentence four, 42 U.S.C. 405(g).  On remand, the ALJ shall (1) consult a medical expert regarding the onset of Plaintiff's Multiple Sclerosis diagnosis and consider the report dated November 12, 2004 by Dr. Nabizadeh when inferring Plaintiff's MS onset date; (2) reevaluate whether Plaintiff's depression was a severe impairment and conduct a proper analysis under 20 C.F.R. § 404.1520a with respect to Plaintiff's depression; and (3) reassess

Plaintiff's claim for disability benefits based on the new evidence and issue a new decision based on substantial evidence and proper legal standards.  The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this  17th  day of May, 2006.

_Monte C. Richardson_

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record